IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| REBECCA M. COOPER | ) |
| | ) No. 1:15-0067 |
| v. | ) Judge Sharp/Bryant |
| | ) |
| SOCIAL SECURITY ADMINISTRATION | ) |

To:   The Honorable Kevin Sharp, Chief Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for Supplemental Security Income (SSI) benefits, as provided under Title XVI of the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which defendant has responded (Docket Entry No. 14). Plaintiff has further filed a reply in support of her motion. (Docket Entry No. 15) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

### I.  Introduction

Plaintiff filed her application for SSI benefits on July 30, 2012, alleging

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

disability beginning June 19, 2008 (subsequently amended to align with her filing date of July 30, 2012), due to post-traumatic stress disorder, depression, a learning disability, illiteracy, and bipolar disorder. (Tr. 90, 274) Her application was denied at the initial and reconsideration stages of agency review, whereupon she requested *de novo* review of her claim by an Administrative Law Judge (ALJ). The ALJ hearing was held on January 8, 2014, and plaintiff appeared (via telephone) with counsel and gave testimony. (Tr. 107-134) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until February 14, 2014, when she issued a written decision in which she concluded that plaintiff was not disabled. (Tr. 90-100) That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since July 30, 2012, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: post-traumatic stress disorder (PTSD), bipolar disorder, and learning disability (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with nonexertional limitations. She could perform simple routine and repetitive tasks in jobs requiring infrequent routine changes in job duties. She could sustain occasional, brief, and superficial interaction with co-workers and supervisors. She should perform jobs that do not require direct public interaction.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on July 18, 1983 and was 29 years old, which is defined

> as a younger individual age 18-49, on the date the application was filed. (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 30, 2012, the date the application was filed (20 CFR 416.920(g)).

(Tr. 92-94, 98-100)

On May 28, 2015, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-4), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following summary is taken from defendant's brief, Docket Entry No. 14 at pages 2-9:

> In a disability report dated August 8, 2012, Plaintiff wrote that she could not read or write (Tr. 274). In a September 4, 2012 function report, Plaintiff wrote that she had always been illiterate (Tr. 281). Each day, she watched television, cleaned, ate, and spent time with family (Tr. 280-81). She had no issues with personal care (Tr. 281). Plaintiff described problems

3

sleeping, having nightmares, having difficulty remembering to take medications, and dealing with anger issues (Tr. 282, 285). She prepared simple meals, did laundry and dishes, checked the mail, shopped once per month, went outside once daily, listened to books on tape, played with her sister's dog, and visited family (Tr. 282-84). Plaintiff had difficulty getting along with others, including her family (Tr. 285). She had trouble focusing, following directions, and concentrating (Tr. 282, 284-86). Earnings records dated June 19, 2013, show that Plaintiff has not worked since 2008, and her earnings from 1998 to 2008 ranged from three years with no earnings to $8,758.00 per year (Tr. 268).

Plaintiff received treatment from Lawrence County Health Department on March 14, 2012 (Tr. 384-86). She reported she had been released from jail six months before and had been out of medication during that time (Tr. 384). A nurse practitioner listed diagnoses of bipolar disorder, major depression, post-traumatic stress disorder (PTSD), and anxiety (Tr. 385-86). Plaintiff was referred to Centerstone Community Mental Health Center and prescribed Carbamazepine, Prozac/Fluoxetine, and Trazodone (Tr. 386). Plaintiff commenced treatment at Life Care Family Services (Life Care) on April 3, 2012 (Tr. 348-378, 491-542). At her first appointment with Jodi Makela, M.A., Plaintiff reported no current suicidal ideation (Tr. 374). She had a history of suicidal thoughts, but she never wanted to act on them (Tr. 374). Plaintiff denied recent substance abuse and reported a stressful living situation (Tr. 368, 373). She said she had trouble filling out job applications because she could not read or write (Tr. 372). She denied any mental health treatment, but she reported being diagnosed with bipolar disorder and having depression and stress (Tr. 363-65). Plaintiff reported her medications were Trazadone, Xanax, and Geodon (Tr. 365). On examination, she was cooperative, fully oriented with appropriate thought content, and had normal attention, affect, and speech (Tr. 376). Ms. Makela diagnosed PTSD and bipolar disorder and recommended case management, medication management, and individual therapy (Tr. 376-77). She assessed a GAF of 46 (Tr. 378).

On April 25, 2012, Nancy Hamlin, a nurse practitioner at Life Care, examined Plaintiff (Tr. 360-62). Although she had sad mood and bland effect, Plaintiff was cooperative and alert with normal speech (Tr. 361). She had appropriate thought content and was fully oriented (Tr. 361). Ms. Hamlin prescribed Lamictal, Trazodone, and Valium (Tr. 361). At her May 9, 2012 appointment, Plaintiff reported negative side effects with Lamictal and asked

for a different sleep medication than Trazodone (Tr. 357). Ms. Hamlin gave her relaxation techniques and explained that Valium was for acute use only and she would need to taper off of it (Tr. 357). She told Plaintiff to take Lamictal at night and prescribed Amitriptyline instead of Trazodone (Tr. 357-58). On examination, Plaintiff was fully alert, oriented, and cooperative with euthymic mood, bright affect, normal speech, and appropriate thought content (Tr. 358). On July 5, 2012, Plaintiff complained of increased symptoms, explaining that her parents were not allowing her to see her children, were verbally abusive, and made her move out (Tr. 354). Plaintiff's mood was anxious, but she was fully alert, oriented, and cooperative (Tr. 355). Ms. Hamlin increased her Lamictal, changed Amitriptyline to Remeron, and refilled her Valium (Tr. 354).

Plaintiff was brought to the emergency room on August 31, 2012, when she was found unresponsive at home (Tr. 427). Plaintiff reported taking Opana, which was not one of her prescriptions (Tr. 427). She reported taking Xanax twice per day, as well as Lortab andNaproxen (Tr. 427). Plaintiff was diagnosed with altered mental status and discharged home the same day (Tr. 427, 431). Plaintiff returned to Lawrence County Health Department on September 17, 2012, and notes do not indicate she mentioned she received care at Life Care (Tr. 382). Plaintiff reported increased depression because she lost custody of her children (Tr. 382). The nurse prescribed Celexa and continued Trazodone (Tr. 383). On October 8, 2012, Plaintiff saw Timothy Holt, an advanced practice registered nurse at Life Care (Tr. 351). Plaintiff reported improved mood symptoms but increased anxiety (Tr. 351). He attributed this to her recent start of hormone replacement therapy (Tr. 351). At her November 18, 2012 appointment, Plaintiff reported an "abrupt onset of ineffectiveness" of her medications, but Mr. Holt noted this coincided with placement of a restraining order on Plaintiff, which prevented her from seeing her son (Tr. 348). Plaintiff admitted to taking more Valium than prescribed, and Mr. Holt advised against this (Tr. 348). Mr. Holt discontinued Lamictal and Remeron and started Geodon and Trazodone (Tr. 348).

Plaintiff underwent a consultative examination performed by Thomas M. Sweets, M.D., on October 13, 2012 (Tr. 343-46). Plaintiff reported that her physical symptoms were minor compared to her PTSD, which made it difficult for her to handle work stress (Tr. 343). She said she witnessed a shooting and a stabbing four years before (Tr. 343). Plaintiff explained that she graduated from high school in a special education program, and she had difficulty with

reading, writing, and performing basic tasks (Tr. 343). However, she could cook, clean, shop, and manage money (Tr. 344). Upon examination, Plaintiff was alert and oriented (Tr. 345). Dr. Sweets wrote he was surprised that Plaintiff had a fairly normal mood and affect and she was quite interactive (Tr. 345). He wrote that she said that her mood was fine, and she seemed to feel quite well (Tr. 345). Her speech was normal, and she was not overly excitable (Tr. 345).Plaintiff's thought process and judgment were normal (Tr. 345). Based on Plaintiff's statements, Dr. Sweets wrote that Plaintiff could have possible learning disorder and literacy problems, and he wrote that her physical examination was normal (Tr. 346).

Plaintiff had an appointment at Lawrence County Health Department on November 26, 2012, when she complained of problems with agitation, sitting still, and pressured speech (Tr. 380). The nurse recommended increased exercise, prescribed Trazodone, and advised Plaintiff to follow up at Life Care (Tr. 381). On January 7, 2013, Plaintiff returned to Mr. Holt at Life Care and reported improvement in her symptoms (Tr. 509-510). Mr. Holt increased her Geodon and continued her Trazodone and Valium (Tr. 510). On January 22, 2013, Brad Williams, M.D., a state agency psychological consultant, reviewed the record and opined that Plaintiff had the ability to understand and perform simple and detailed tasks, but not multi-step tasks (Tr. 187). She could sustain concentration, persistence, and pace with customary breaks (Tr. 187). Dr. Williams further opined Plaintiff could interact appropriately with the general public, supervisors, and peers (Tr. 187). However, she would work better with things than with people (Tr. 187). Finally, Plaintiff could set practical goals and adapt to routine workplace changes (Tr. 187). Plaintiff had two appointments with Mr. Holt in March 2013, when, despite being anxious with constricted affect, she was alert and fully oriented, cooperative, and had normal speech and thought content (Tr. 504-05, 507-08). Plaintiff reported insomnia in late March (Tr. 504). Her mental status examination was unchanged in April, and Mr. Holt prescribed Amitriptyline when Plaintiff complained Hydroxyzine was ineffective (Tr. 501).

On June 30, 2013, Plaintiff was taken to the emergency room for suicidal ideation and hearing voices (Tr. 391, 394). She was transferred to Jeffrey Robbins, M.D., at Western Mental Health Institute, where she was admitted on July 1, 2013 (Tr. 395, 467). Plaintiff said she had auditory hallucinations and thoughts of shooting herself with a gun (Tr. 467). The next day, Dr. Robbins wrote that Plaintiff had a "miraculous resolution of all of it"

(Tr. 471). He wrote that she had probably fulfilled her goal of getting an inpatient stay on record for her disability claim and also had a court date on that day she avoided (Tr. 471). Dr. Robbins wrote she was bright and smiling within hours of admission (Tr. 471). He prescribed Celexa and Trazadone, diagnosed her with malingering and depressive disorder, and assessed a GAF of 45 (Tr. 467-68).

Plaintiff returned to Mr. Holt on July 8, 2013 (Tr. 495). Mr. Holt noted Plaintiff failed to tell him about her recent hospitalization and gave him the impression she was taking her medications as prescribed (Tr. 495). Mr. Holt continued Plaintiff's medications and recommended she follow up in one month (Tr. 496). Plaintiff did not return to Life Care until October 15, 2013, when she went to a different location and saw Kelsey Kent, an advanced practice registered nurse (Tr. 491-92). Plaintiff reported doing very well and denied auditory or visual hallucinations and substance abuse (Tr. 492). She described her mood as good, and she denied suicidal ideations (Tr. 492). She admitted to sometimes wanting to hurt others, but she said she felt she was in control and that no one was in danger (Tr. 492). On January 2, 2014, Ms. Dianne Faulkner, R.C.M.A., N.C.P.T., at Life Care submitted a letter stating Plaintiff was a client at the facility (Tr. 543). Ms. Faulkner wrote that Plaintiff was incapable of gainful employment and was currently seen as a Safety Net client because she lacked insurance (Tr. 543).

Plaintiff submitted additional records to the Appeals Council from Crockett Hospital dated February 13, 2014, through March 29, 2014 (Tr. 33-86). Other than a record for knee pain on February 13, 2014, the rest of the records from Crockett Hospital were dated after the ALJ's decision (Tr. 33-86). Plaintiff was hospitalized for suicidal ideation with drug overdose from March 26, 2014, through March 29, 2014 (Tr. 44-45). Plaintiff also submitted records from Center Stone dated April 17, 2014, through June 12, 2014 (Tr. 8-27).

At an administrative hearing held on January 8, 2014, Plaintiff testified over the telephone, as she was incarcerated for trespassing and failure to pay child support (Tr. 107-09, 113). Plaintiff testified she graduated from high school with a special education diploma (Tr. 111). Her three children lived with her mother, who had temporary custody of them since two years before (Tr. 112). She had a driver's license at one time, but it had been revoked for failure to pay child support (Tr. 114). Plaintiff was on probation for selling Xanax six years before (Tr. 115). Prior to her incarceration, she lived with a

friend who helped her manage her appointments and medications (Tr. 116). Plaintiff played with her friend's dogs, watched television, cooked, swept, and mopped (Tr. 116-17). She visited her children two to three times per week and sometimes stayed with them on weekends (Tr. 117).

Plaintiff testified her biggest impediment to working was inability to focus (Tr. 118). She did not like being in crowds, and she had trouble sleeping, but her medications sometimes helped to calm her (Tr. 118, 120-21). She also heard voices, and they sometimes told her to harm herself (Tr. 118-19). Plaintiff described having fatigue, lack of energy, nightmares, and hallucinations (Tr. 122-23). She said she had not used marijuana or drank alcohol since her July 2013 hospital stay (Tr. 124). The ALJ asked about a restraining order against Plaintiff to prevent her from seeing her son, but Plaintiff said she did not know the basis for the order (Tr. 125).

The ALJ asked the vocational expert, Lowell Latto, a hypothetical question that assumed an individual of Plaintiff's age, education, and work experience who could perform a full range of work at all exertional levels but with nonexertional limitations (Tr. 130-31). The individual was limited to simple, routine, and repetitive tasks in jobs requiring infrequent routine changes and work duties (Tr. 130). She could perform jobs involving only occasional, brief, and superficial interaction with coworkers and supervisors (Tr. 130-31). The jobs could not require direct public interaction (Tr. 131). In response, the vocational expert testified that individual could perform medium, unskilled jobs such as vehicle cleaner (303,000 positions nationally and 4,200 in Tennessee); sandwich maker (785,000 positions nationally and 8,000 in Tennessee); and dish washer (549,000 positions nationally and 5,000 in Tennessee) (Tr. 131-32). The vocational expert testified that his testimony was consistent with the Dictionary of Occupational Titles (DOT) (Tr. 132).

### III. Conclusions of Law

#### A. <u>Standard of Review</u>

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. <u>Elam ex rel. Golay v. Comm'r of Soc. Sec.</u>, 348 F.3d

8

124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). While this is a deferential standard, it is not a trivial one; a finding of substantial evidence must "take into account whatever in the record fairly detracts from its weight." Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990). Nevertheless, the SSA's decision must stand if substantial evidence supports the conclusion reached, even if the record contains substantial evidence that would have supported an opposite conclusion. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-

step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520, 416.920. "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry ... the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 474 (6th Cir. 2003) (citing Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987)).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when

10

the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred in failing to properly consider and evaluate the severity of her mental health treatment records, which she contends are supportive of her claim for benefits. She argues that "the ALJ completely rejected this evidence in her decision" (Docket Entry No. 13 at 7), despite its documentation of significant symptoms of depression and anxiety, an inpatient psychiatric hospitalization following a purported suicide attempt, and Global Assessment of Functioning (GAF) scores indicative of serious symptoms. Plainly, however, the ALJ did not completely reject the evidence of

11

plaintiff's mental impairments, as such evidence was thoroughly discussed in her decision and was the foundation for the significant mental limitations reflected in the RFC finding. Plaintiff bemoans the perceived inconsistency between, on one hand, the ALJ's rejection of the low GAF score assigned at plaintiff's intake to mental health treatment by Ms. Makela because she only saw plaintiff on one occasion, and on the other hand, the ALJ's assignment of great weight to the opinion of consultants who never examined plaintiff at all. She further complains that the nonexamining consultants were not privy to a significant amount of medical evidence of record, as they opined in October 2012 and January 2013, respectively.

However, the ALJ was entitled to consider the fact that Ms. Makela was not an acceptable medical source and only saw plaintiff one time in weighing her assignment of a GAF score indicating serious limitations, and for that matter was not required to give any particular rationale for disregarding an intake GAF score, or any GAF score. Such scores have long been held to be of limited utility in the disability determination, as they are not a reasonable replacement for the more particularized data available in actual treatment notes or reports of examination results, but instead are largely superficial descriptors representing "a clinician's subjective rating of an individual's overall psychological functioning" in terms "understandable by a lay person." See, e.g., Kennedy v. Astrue, 247 Fed. Appx. 761, 766 (6th Cir. Sept. 7, 2007); see also, e.g., Smith v. Astrue, 565 F.Supp.2d 918, 925 (M.D. Tenn. 2008). The ALJ appropriately recognized that this score was assigned at plaintiff's intake to mental health treatment at Life Care, following a period of six months during which she had been out of her prescription medication. (Tr. 95) Ms. Makela's treatment note was given explicit consideration despite the fact that she is not an acceptable medical source, and did not offer any opinion of functional limitations aside from the lone GAF score addressed above. The

12

SSA's rulings and regulations do not require more. See 20 C.F.R. § 416.913(a), (d)(1); SSR 06-3p, 2006 WL 2329939, at *6; Morris v. Comm'r of Soc. Sec., 2012 WL 4953118, at *11 (W.D. Mich. Oct. 17, 2012).

Moreover, as to the effect of subsequently generated evidence upon the weighing of the nonexamining consultants' opinions, it does not appear that the subsequent evidence was favorable to plaintiff. The ALJ discussed the evidence which postdated Dr. de la Torre's and Dr. Williams's opinions (Tr. 97-98), but does not appear to have relied on any such evidence to support the inclusion of work-related mental limitations, nor does plaintiff suggest that further limitations are apparent from such evidence. In any event, the ALJ recognized that the record supported greater limitations on social functioning than the nonexamining consultants' opinions indicated, and so gave them partial weight. (Tr. 98) Accordingly, the ALJ did not err in relying in part on the relatively early opinions of the nonexamining consultants.

Plaintiff further argues that the ALJ erred in rejecting Dr. Robbins's assignment of a GAF score of 45 as inconsistent with his diagnosis of plaintiff as a malingerer, when that score was assigned at the same time as -- not before -- plaintiff's diagnosis, rendering the ALJ's rejection of it tantamount to a substitution of the ALJ's opinion for Dr. Robbins's opinion. However, in addition to the above discussion of the limited utility of GAF scores, it appears that Dr. Robbins considered plaintiff's prognosis compromised by her alcohol and drug issues, rather than any identified limitations of her mental functioning. (Tr. 468) Inasmuch as the GAF score at issue can reflect "serious symptoms" or "any serious impairment in social, occupational, or school functioning," American Psychiatric Ass'n,

13

DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000), the ALJ cannot be faulted for rejecting it as a measure of work-related functional loss in the face of the clinical diagnosis of malingering.

Plaintiff next argues that the ALJ erred in her consideration of a letter written by Ms. Dianne Faulkner, R.C.M.A., N.C.P.T., of Life Care. (Tr. 543) In that letter, Ms. Faulkner summarily states that plaintiff is uninsured and "is currently incapable of gainful employment[.]" Id. The ALJ gave due consideration to this opinion, noting that Ms. Faulkner never treated plaintiff in any capacity and assigning her letter opinion no weight due to the fact that it is entirely conclusory and not supported by the evidence, but in fact is merely an opinion on the ultimate legal issue of disability which is reserved to the SSA. (Tr. 98) Plaintiff cites her diagnoses and GAF scores as evidence which does support her claim to disability, and complains that the ALJ did not explain how the mental health treatment notes containing these items are inconsistent with Ms. Faulkner's opinion that she is unable to work. (Docket Entry No. 15 at 2) However, the balance of the ALJ's discussion concerning plaintiff's mental RFC stands as sufficient support for the finding that Ms. Faulkner's contrary, conclusory opinion on the ultimate issue in the case is not worthy of perceptible weight. Social Security Ruling (SSR) 96-5p, cited by plaintiff, speaks of the ALJ's duty to evaluate, rather than ignore, the opinions of medical sources on issues reserved to the SSA. There is no indication that Ms. Faulkner is a "medical source" as contemplated by this SSR, which speaks to the interplay between the regulatory deference due the opinions of treating, examining, and nonexamining "acceptable medical sources," 20 C.F.R. § 416.927(a), and the reservation of dispositive legal issues to agency decisionmakers, 20 C.F.R. §. 416.927(e), in the instance where such a medical source opines not on the claimant's functional abilities or

limitations, but on the disabling effect of such. In any event, the SSR specifically provides that "[s]uch opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance." 1996 WL 374183, at *5 (S.S.A. July 2, 1996). The ALJ here gave explicit consideration to this letter from Ms. Faulkner, and thus satisfied her duty to consider such evidence.

Plaintiff's final argument is that the ALJ erred in failing to conduct a proper credibility analysis as required by SSR 96-7p. Plaintiff contends that the ALJ merely recited the criteria for evaluating credibility, and then offered a conclusory statement that plaintiff's allegations were not credible. This is simply not so. In fact, the ALJ made reference to the numerous occasions when plaintiff made inconsistent or incomplete representations to her treatment providers, particularly as it concerned the psychotropic medications she was taking. (Tr. 95-97) The ALJ concluded that "[i]t is unclear how compliant she was with a medication regimen given the multiple providers who were prescribing medications without each other's knowledge." (Tr. 98) The ALJ further discussed the evidence bearing on plaintiff's credibility as follows:

> The claimant testified from jail where she was being held for failure to pay child support. She is currently on probation for selling Xanax several years ago and testified that she has passed all of her drug screens since her hospitalization in July 2013. She has not attempted to work since 2008 and has never earned income above the level considered to be significant gainful activity which undermines her credibility. She has said at different times that she has difficulty reading and writing and at other times that she is illiterate. A Function Report submitted to the record on September 4, 2012, purports to have been completed by the claimant and contains fairly detailed, sufficient answers to all the questions. (Ex. B3E). That same Function Report says she is able to count change. There is no evidence that she is illiterate. Her driver's

>license is currently revoked or suspended, but she has been capable of obtaining one in the past.

(Tr. 98) And, of course, most damning to plaintiff's credibility was the report of Dr. Robbins, rendered after plaintiff's hospitalization for reported suicidal ideation and plan, and described by the ALJ in reviewing plaintiff's medical history: "The next day staff psychiatrist Jeffrey Robbins, M.D., noted the claimant had a 'miraculous resolution of all of it' and diagnosed her with malingering. He said that she probably had fulfilled her goal of getting an inpatient stay on record for her disability claim and also had a court date on that day that she avoided. He said that she was 'bright and smiling' within hours of admission." (Tr. 97) The ALJ clearly weighed the evidence and explained her determination that plaintiff is not fully credible. Such a weighing of credibility is firmly within the ALJ's province, and is due significant deference on judicial review. See, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997). There is no reason whatsoever to disturb the credibility finding in this case.

Finally, defendant makes reference to the additional evidence submitted for the first time before the Appeals Council, and presented in plaintiff's brief (Docket Entry No. 13 at 4) as though pertinent here. However, the Appeals Council did not assert jurisdiction and render its own decision based upon the record including this newly submitted evidence, but rather declined to review the case after considering the new evidence, leaving the ALJ's decision as the final agency decision on plaintiff's disability claim. In such circumstances, the new evidence, which was not before the ALJ, is outside the scope of judicial review. See, e.g., Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148-49 (6th Cir. 1996). Defendant states in its

brief that "[w]here it is clear, as in this case, that the Appeals Council considered new evidence and found that it did not warrant changing the ALJ's decision, the court must determine whether the ALJ's decision is supported by substantial evidence, even including the additional evidence." (Docket Entry No. 14 at 19) (citing Cotton v. Sullivan, 2 F.3d 692, 696 (6th Cir. 1993)). However, this is not the law in the Sixth Circuit, as made clear in Cotton, supra (presenting the standard advanced in defendant's brief as the law of the Eighth Circuit, different from Sixth Circuit precedent). Accordingly, the evidence generated after the ALJ issued her decision and presented for the first time before the Appeals Council may not be considered by this Court.

In sum, the decision of the ALJ is supported by substantial evidence on the record as a whole. That decision should therefore be affirmed.

### IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985);

17

Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

      **ENTERED** this 23rd day of August, 2016.

                             s/ John S. Bryant
                             JOHN S. BRYANT
                             UNITED STATES MAGISTRATE JUDGE